## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| FAIRFIELD UNIVERSITY, | : | CIVIL ACTION NO. |
| | : | |
| *Plaintiff*, | : | 3:20cv-01369-JCH |
| | : | |
| v. | : | |
| | : | |
| VIGILANT INSURANCE COMPANY AND | : | |
| FEDERAL INSURANCE COMPANY, | : | |
| | : | |
| *Defendants*. | : | September 9, 2021 |

### OPPOSITION OF DEFENDANTS FEDERAL INSURANCE COMPANY AND VIGILANT INSURANCE COMPANY TO PLAINTIFF FAIRFIELD UNIVERSITY'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendants Federal Insurance Company ("Federal") and Vigilant Insurance Company ("Vigilant") (collectively, "Chubb" or "Defendants") hereby oppose plaintiff Fairfield University's ("Fairfield") Motion for Partial Summary Judgment, and submit contemporaneously herewith Defendants' Local Rule 56(a)(2) Statement of Facts.

## I.     INTRODUCTION

Federal issued a series of primary domestic commercial general liability policies to Fairfield, with separate, annual policy periods from July 1, 1997 to July 1, 2009, and a series of commercial excess and umbrella liability policies to Fairfield, with separate, annual policy periods from July 1, 1997 to July 1, 2008.[1]  Each of the excess liability policies issued to Fairfield by Federal for the policy periods from July 1, 2004 to July 1, 2008 (the "2004-2008

---

[1] Federal did not issue any excess or umbrella liability policy to Fairfield for the period from July 1, 2008 to July 1, 2009.

***ORAL ARGUMENT REQUESTED***

Excess Policies") contained a Sexual Abuse or Molestation Exclusion,[2] which applies to preclude coverage for the underlying sexual abuse claims or suits alleging injury during those policy periods.  Vigilant issued a series of primary international commercial general liability policies to Fairfield, with separate, annual policy periods from September 1, 2003 to July 1, 2009.[3]  (Collectively, all of the policies issued by Federal and Vigilant to Fairfield will be referred to as the "Chubb Policies.")[4]

By its Motion for Partial Summary Judgment, Fairfield attempts to avoid the impact of the Sexual Abuse or Molestation Exclusions contained in the 2004-2008 Excess Policies by relying on the Non Accumulation of Limits Endorsements on the domestic and international primary policies issued to Fairfield by Federal and Vigilant (the "Non Accumulation of Limits Endorsements"), respectively, covering the July 1, 2004 to July 1, 2009 policy periods.  The Non Accumulation of Limits Endorsements state in virtually identical form:

> This policy is one of several policies issued by us or other member insurers of the Chubb Group of Insurance Companies to you, and/or your subsidiary companies.  It is agreed that any claim or **suit** which could be ***covered*** under two or more of these policies will be ***covered*** under only the policy with the highest limit of insurance available or, if the limits are the same, under only one of the policies.  Regardless of the number of claims or **suits**, the number of policies, or the number of additional **insureds** which would be involved, the combined total ***annual*** aggregate limits of liability under all such policies to which this endorsement is attached will not exceed the aggregates stated below ***for any one policy year***:

> $2,000,000     General Aggregate Limit
>                       Products-Completed Operations Aggregate Limit

---

[2] Each of the Federal excess policies in effect from July 1, 2004 to July 1, 2007 contained a "Sexual Abuse or Molestation Exclusion."  Each of the Federal excess policies in effect from July 1, 2007 to July 1, 2008 contained an "Abuse or Molestation – Total Exclusion."  Each exclusion operates to bar coverage under the respective policy for the underlying sexual abuse claims and suits.  These exclusions will be referred to collectively herein as the "Sexual Abuse or Molestation Exclusions."

[3] The first of the primary international policies issued by Vigilant to Fairfield was for a partial year:  September 1, 2003 to July 1, 2004.

[4] The pertinent sections of the Chubb Policies are attached as Exs. 1.A-1.L, 2.A.-2.F., and 3.A.-3.K.

Advertising Injury and Personal Injury Aggregate Limit

**_All other terms and conditions remain unchanged._**

*See e.g.*, Exs. 1.H.; 1.I.; 1.J.; 1.K.; 1.L; 2.B.; 2.C.; 2.D.; 2.E.; and 2.F. (bold type in original, underscored, italicized bold type added).

Fairfield advances the unsupported, and insupportable, contention that the Non Accumulation of Limits Endorsements operate to expand the scope of coverage under the excess liability policy issued by Federal to Fairfield for the policy period from July 1, 1999 to July 1, 2000 (the "1999-2000 Excess Policy"), by shifting coverage for "claims" and "suits" alleging injuries that took place after that policy had expired, and during the periods of the 2004-2008 Excess Policies when the Sexual Abuse or Molestation Exclusions were in effect, to the single policy period of the 1999-2000 Excess Policy.  Fairfield's argument fails for multiple reasons.

First, it is an express condition of the Non Accumulation of Limits Endorsements on the Chubb Policies that the "claim or **suit**" "be ***covered*** under two or more of [the Chubb] policies." *See e.g.*, Exs. 1.H.; 1.I.; 1.J.; 1.K.; 1.L; 2.B.; 2.C.; 2.D.; 2.E.; and 2.F. (emphasis added).  Each of the Chubb Policies is an occurrence-based policy with an annual policy period, and covers only those damages that the insured becomes legally obligated to pay for "bodily injury" "that occurs during the policy period."  *See e.g.*, Exs. 1.A.; 1.B.; 1.C.; 1.D.; 1.E.; 1.F.; 1.G.; 1.H.; 1.I.; 1.J.; 1.K.; 1.L.; 2.A.; 2.B.; 2.C.; 2.D.; 2.E.; and 2.F.  The Non Accumulation of Limits Endorsements on the Chubb Policies do not change this, as they refer to "annual" limits of liability "for any one policy year" and also specifically state, "All other terms and conditions [of the Chubb Policies] remain unchanged."  *See* e.g., Exs. 1.H.; 1.I.; 1.J.; 1.K.; 1.L; 2.B.; 2.C.; 2.D.; 2.E.; and 2.F. Rather, the Non Accumulation of Limits Endorsements operate to prevent the stacking of limits when there are two or more Chubb Policies that cover the same policy period and hence the same

3

damages for bodily injury that occur in that policy period.  As such, two or more Chubb Policies "cover" the same "claim or **suit**" only if they were in effect ***during the same policy period*** and, therefore, "cover" the same damages for bodily injury occurring in that policy period and alleged in that "claim or **suit**."  The Non Accumulation of Limits Endorsements do not permit Fairfield to reach outside of the 2004-2008 Excess Policies, and shift coverage for injuries which occurred during the periods of those policies to the earlier 1999-2000 Excess Policy.

Second, Fairfield's argument also rests on the fundamentally incorrect premise that the underlying sexual abuse claims and suits are "long-tail claims" – such as asbestos bodily injury claims or environmental contamination claims.  However, "long-tail claims" involve progressive injuries that by their very nature are fraught with difficulties in determining the dates of injuries. In contrast, in applying occurrence-based policies like the Chubb Policies to sexual abuse claims, courts have treated sexual abuse claims not as "long-tail claims," but rather as being covered only under the policy period or periods in which the abuse claimant suffered actual molestation. Despite building its entire argument around the application of "long-tail claims" coverage principles, Fairfield does not cite a single case that has considered sex abuse claims to be "long-tail claims."

Third, apparently recognizing that its argument fails when each of the 169 underlying sexual abuse "claims" or "suits" is evaluated individually for coverage under the Chubb Policies, Fairfield advances the absurd proposition that all 169 claims and lawsuits constitute a single "suit."  However, comprising the 169 claims and suits are the Complaints of fifty-one (51) plaintiffs who sued Fairfield and other defendants in fifty-one (51) separate lawsuits in this Court (the "PPT II Lawsuits"), the claims of another eighty-three (83) alleged victims represented by, and whose identities were disclosed by, the plaintiffs' counsel during the pendency of the PPT II

4

Lawsuits (the "Represented Claims"), and those of thirty-five (35) other alleged victims who submitted claims after a settlement was reached (the "Unrepresented Claims"). Each of the PPT II Lawsuits constituted a separate "suit," and each of the Represented Claims and the Unrepresented Claims constituted a separate "claim," under the Chubb Policies, and each of the PPT plaintiffs and claimants alleged discrete bodily injuries caused by discrete acts of molestation or abuse in different policy years.

Fourth, even if the 169 underlying claims and suits were somehow a single "suit" under the Chubb Policies, which they are not, it would not change the coverage result, as the Non Accumulation of Limits Endorsements do not shift coverage for damages for bodily injury from discrete acts of molestation or abuse across policy years to a single policy year prior to the Sexual Abuse or Molestation Exclusions' effective dates.

## II.   MATERIAL FACTS

### A.   The PPT II Lawsuits

This action concerns a dispute between Fairfield and Chubb regarding coverage for underlying claims and suits – comprising the 51 PPT II Lawsuits filed in this Court,[5] the eighty-three (83) Represented Claims, and the thirty-five (35) Unrepresented Claims – alleging that several defendants, including Fairfield, were liable for, *inter alia*, negligent supervision and

---

[5] The filings in the PPT II Lawsuits are a matter of public record of which the Court must take judicial notice. *See* Fed. R. Evid. 201(b), (c) (if a party requests it and the court is supplied with the necessary information, the Court must take judicial notice of facts outside the trial record that are "not subject to reasonable dispute." Such facts must either be "(1) generally known within the trial court's territorial jurisdiction; or (2) [capable of being] accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *see also Internat'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998) (under Fed. R. Evid. 201(b), "[a] court may take judicial notice of a document filed in another court . . . to establish the fact of such litigation and related filings."); *Ives Lab., Inc. v. Darby Drug Co.*, 638 F.2d 538, 544 n. 8 (2d Cir. 1981), *rev'd on other grounds*, *Inwood Lab., Inc. v. Ives Lab., Inc.*, 456 U.S. 844 (1982) (taking judicial notice of several indictments to establish that such indictments had in fact been returned). The necessary information for the Court to access the PPT II Lawsuits and the filings therein is provided below.

breach of fiduciary duty related to the alleged sexual abuse of more than a hundred boys on various dates over a ten-year period from 1998 to 2008 at Project Pierre Toussaint ("PPT"), a residential school in Haiti that Fairfield helped to found, support and oversee.

On January 6, 2014, the Court ordered twenty-nine (29) of the PPT II Lawsuits consolidated "for pre-trial purposes," under the lead case, *Gervil St. Louis v. Perlitz et al.*, ("*St. Louis*") Civil Action No.: 3:13-cv-01132-RNC, the first of the PPT II Lawsuits which had been filed on August 8, 2013.  *See* Order dated January 6, 2014 (per Chatigny, U.S.D.J.), USDC Docket, *St. Louis*.[6]  Subsequently, the remaining lawsuits comprising the PPT II Lawsuits were consolidated[7] for pretrial purposes with the lawsuits previously consolidated for pretrial

---

[6]  The twenty-nine (29) PPT II Lawsuits initially consolidated under the *St. Louis* lawsuit comprised the following: (1) *Jean v. Perlitz et al*, C.A. No.: 3:13-cv-01225-RNC; (2) *Pierre v. Perlitz et al*, C.A. No.: 3:13-cv-01269-RNC; (3) *Jerome v. Perlitz et al*, C.A. No.: 3:13-cv-01437-RNC; (4) *Bernardin v. Perlitz et al*, C.A. No.: 3:13-cv-01480-RNC; (5) *Joseph v. Perlitz et al*, C.A. No.: 3:13-cv-01626-RNC; (6) *Alibert v. Perltz et al*, C.A. No.: 3:13-cv-01627-RNC; (7) *Faustin v. Perlitz et al*, C.A. No.: 3:13-cv-01628-RNC; (8) *Joseph v. Perlitz et al*, C.A. No.: 3:13-cv-01629-RNC; (9) *Jean v. Perlitz et al*, C.A. No.: 3:13-cv-01630-RNC; (10) *Fleuridor v. Perlitz et al*, C.A. No.: 3:13-cv-01631-RNC; (11) *Jean v. Perlitz et al*, C.A. No.: 3:13-cv-01632-RNC; (12) *Lecenat v. Perlitz et al*, C.A. No.: 3:13-cv-01633-RNC; (13) *Guillaume v. Perlitz et al*, C.A. No.: 3:13-cv-01634-RNC; (14) *Joseph v. Perlitz et al*, C.A. No.: 3:13-cv-01635-RNC; (15) *Emile v. Perlitz et al*, C.A. No.: 3:13-cv-01636-RNC; (16) *Audate v. Perlitz et al*, C.A. No.: 3:13-cv-01637-RNC; (17) *Fils-Aime v. Perlitz et al*, C.A. No.: 3:13-cv-01638-RNC; (18) *Odilbert v. Perlitz et al*, C.A. No.: 3:13-cv-01639-RNC; (19) *Albert v. Perlitz et al*, C.A. No.: 3:13-cv-01640-RNC; (20) *Jean-Pierre v. Perlitz et al*, C.A. No.: 3:13-cv- 1641-RNC; (21) *Lecenat v. Perlitz et al*, C.A. No.: 3:13-cv- 1642-RNC; (22) *Previl v. Perlitz et al*, C.A. No.: 3:13-cv-01644-RNC; (23) *Benjamin v. Perlitz et al*, C.A. No.: 3:13-cv-01645-RNC; (24) *Bernard v. Perlitz et al*, C.A. No.: 3:13-cv-01647-RNC; (25) *Pierre v. Perlitz et al*, C.A. No.: 3:13-cv-01648-RNC; (26) *Dorcine v. Perlitz et al*, C.A. No.: 3:13-cv-01701-RNC; (27) *Calixte v. Perlitz et al*, C.A. No.: 3:13-cv-01767-RNC; (28) *Pierre v. Perlitz et al*, C.A. No.: 3:13-cv-01768-RNC; and (29) *Bien-Aimé v. Perlitz et al*, C.A. No.: 3:13-cv- 01769-RNC.

[7]  Five (5) of the PPT II Lawsuits were consolidated by an Order dated March 28, 2014, namely: (1) *Baptiste v. Perlitz et al*, C.A. No.:3:13-cv-01881-RNC; (2) *Clervil v. Perlitz et al*, .A. No.:3:13-cv-01904-RNC; (3) *Saint Cirin v. Perlitz et al*, .A. No.:3:13-cv-01906-RNC; (4) *Derice v. Perlitz et al*, .A. No.:3:13-cv-01907-RNC;  and (5) *Mackenson v. Perlitz et al*, C.A. No.:3:13-cv-00125-RNC.  *See* USDC Docket, *St. Louis*.  Another three (3) of the PPT II Lawsuits were consolidated by an Order dated June 26, 2014, namely: (1) *St. Louis v. Perlitz et al*, C.A. No.:3:13-cv-01132-RNC; (2) *Deriza v. Perlitz et al*, .A. No.:3:13-cv-00668-RNC; and (3) *Cameus v. Perlitz et al*, C.A. No.:3:13-cv-00815-RNC.  *Id.*  An additional eighteen (18) of the PPT II Lawsuits were consolidated by an Order dated March 27, 2018, namely: (1) *Francois v. Perlitz et al*, C.A. No.: 3:14-cv-01436-RNC; (2) *Michel v. Perlitz et al*, C.A. No.: 3:14-cv-01530-RNC; (3) *Alcinord v. Perlitz et al*, C.A. No.: 3:14-cv-01569-RNC; (4) *Robenson v. Perlitz et al*, C.A. No.: 3:14-cv-01570-RNC; (5) *Estacin v. Perlitz et al*, C.A. No.: 3:14-cv-01615-RNC; (6) *Compere v. Perlitz et al*, C.A. No.: 3:14-cv-01962-RNC; (7) *Edmond v. Perlitz et al*, C.A. No.: 3:14-cv-01964-RNC; (8) *Francois v. Perlitz et al*, C.A. No.: 3:14-cv-01967-RNC; (9) *Telmir v. Perlitz et al*, C.A. No.: 3:14-cv-01969-RNC; (10) *Pierre v. Perlitz et al*, C.A. No.: 3:14-cv-01979-RNC; (11) *Alcy v. Perlitz et al*, C.A. No.: 3:14-cv-01526-RNC; (12) *Pierre v. Perlitz et al*, C.A. No.: 3:14-cv-01084-RNC; (13) *Frezin v. Perlitz et al*, C.A. No.: 3:14-cv-01155-RNC; (14) *Papillon v. Perlitz et al*, C.A. No.: 3:14-cv-01533-RNC; (15) *Peniel v. Perlitz et al*, C.A. No.:

purposes. *See* Orders dated March 28, 2014, June 26, 2014 and March 27, 2018 (per Chatigny,

U.S.D.J.), USDC Docket, *St. Louis*.[8] 

### B.    The Settlement of the PPT II Lawsuits and the PPT Claims

In response to the Court's concern that the PPT II Lawsuits would be "never-ending,"

hearing transcripts disclose that counsel for the PPT plaintiffs suggested in 2014, and again in

2015, that a class action might be used as a "vehicle" to provide finality, if a settlement could be

---

3:14-cv-01648-RNC; (16) *Jean-Noel v. Perlitz et al*, C.A. No.: 3:14-cv-01846-RNC; (17) *Derilien v. Perlitz et al*, C.A. No.: 3:14-cv-01418-RNC;  and (18) *Augustin v. Perlitz et al*, C.A. No.: 3:14-cv-01872-RNC. *Id.*  Of the total of fifty-five (55) PPT II Lawsuits filed, three (3) lawsuits were dismissed, namely, *Clervil v. Perlitz et al*, C.A. No.:3:13-cv-01904-RNC, *Cameus v. Perlitz et al*, C.A. No.:3:13-cv-00815-RNC and *Jean v. Perlitz et al*, C.A. No.: 3:13-cv-01632-RNC, and a Suggestion of Death was filed in regard to a fourth lawsuit, filed by Dimitry Joseph, *Joseph v. Perlitz et al*, C.A. No.: 3:13-cv-01635-RNC, resulting in a total of fifty-one (51) PPT II Lawsuits.

[8]

[9] *See*

[10] *See*

[11] For a list of the eighty-three (83) Represented Claims, please see



2933814_1

reached in the PPT II Lawsuits, which would then result in a "settlement class" and a "bar date" for any further claims being made.  *See* Transcript of Telephone Conference before Hon. Robert N. Chatigny, U.S.D.J., dated July 7, 2014, USDC Docket, *St. Louis* at 6; Transcript of Status Conference before Hon. Robert N. Chatigny, U.S.D.J., dated February 17, 2015, USDC Docket, *St. Louis* at 10. ██████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████

████████████████████████████████████████████

    In accordance with the suggestion of the PPT plaintiffs' counsel to use a class action as a settlement "vehicle" in order to stem Fairfield's liability for all claims irrespective of whether or not they had been filed at the time of settlement, the settlement covered not only the fifty-one (51) PPT II Lawsuits, but also the eighty-three (83) Represented Claims not yet in suit, and any other potential, unknown victims who had not yet raised claims – eventually consisting of the thirty-five (35) Unrepresented Claims. ██████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

---

[12] Douglas Pertlitz was the Director of PPT.  All of the PPT plaintiffs and PPT claimants alleged sexual abuse by Pertlitz.  Father Paul Carrier was Fairfield's University Chaplain and a member of its faculty.  Father Carrier was named as a defendant in all of the PPT II Lawsuits, and claims of negligent supervision and breach of fiduciary duty were asserted against him for his role at Fairfield with respect to PPT.  One of the PPT plaintiffs, Bernard Michel



In accordance with this, on January 25, 2019, after the settlement fund was established, the PPT plaintiffs moved for leave to file a class action complaint (the "Motion for Leave") "so that Rule 23 allegations [could] be added, in order to effectuate the

---

("Michel"), also asserted two (2) federal statutory claims that he was sexually abused by Father Carrier. However, Michel's statutory claims against Father Carrier were dismissed. *See* Ruling and Order dated March 31, 2016 (per Chatigny, U.S.D.J.), USDC Docket, *St. Louis*. Michel failed thereafter to amend his complaint to add common law claims against Father Carrier for his alleged abuse. *See* USDC Docket, *St. Louis*.

proposed settlement." *See* Motion for Leave, USDC Docket, *St. Louis*, docket entry dated January 25, 2019, at 5.  The PPT plaintiffs' Motion for Leave to file the class action complaint specifically stated that, if the Court did not approve the settlement, the class action complaint would be withdrawn, "and the original Complaints will remain the operative pleadings in the Plaintiffs' cases." *See id.*  The Motion for Leave was allowed, and a class action complaint was filed seeking certification of a "settlement class." *See* USDC Docket, *St. Louis,* docket entries dated January 25, 2019.

By an Interim Approval Order dated June 6, 2019, the Court certified the Settlement Class.  *See* Order dated June 6, 2019 (*per* Chatigny, U.S.D.J.), USDC Docket, *St. Louis*.  By a Final Approval Order dated August 27, 2019, the Court found that the statutory notice requirements were satisfied, and issued final approval of the settlement according to the terms of its Interim Approval Order.  *See* Order dated August 27, 2019 (*per* Chatigny, U.S.D.J.), USDC Docket, *St. Louis.* Judgment entered on September 26, 2019.  *See* Judgment dated September 26, 2019, USDC Docket, *St. Louis*.  The only purpose of the class action complaint and procedure was to settle all fifty-one (51) of the pending PPT II Lawsuits, along with any unfiled Represented Claims or Unrepresented Claims, and to bar all future claims against Fairfield and other defendants arising out of alleged sexual abuse at PPT, so that, in the words of the Court (Chatigny, U.S.D.J.), litigation would not be "never-ending." *See generally* Settlement Agreement, Fairfield Ex. M; *see also* Transcript of Telephone Conference before Hon. Robert N. Chatigny, U.S.D.J., dated July 7, 2014, USDC, *St. Louis* at 6; Transcript of Status Conference before Hon. Robert N. Chatigny, U.S.D.J., dated February 17, 2015, USDC Docket, *St. Louis* at 10.

████████████████████████████████████████

████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████

### C. The Chubb Policies

Federal issued a series of primary domestic commercial general liability policies to Fairfield, individually, "Domestic Primary Policy," collectively, "domestic primary policies," with separate, annual policy periods from July 1, 1997 to July 1, 2009. *See* Ex. 1.A. (Domestic Primary Policy, July 1, 1997-July 1, 1998); Ex. 1.B. (Domestic Primary Policy, July 1, 1998-July 1, 1999); Ex. 1.C. (Domestic Primary Policy, July 1, 1999-July 1, 2000); Ex. 1.D. (Domestic Primary Policy, July 1, 2000-July 1, 2001); Ex. 1.E. (Domestic Primary Policy, July 1, 2001-July 1, 2002); Ex. 1.F. (Domestic Primary Policy, July 1, 2002-July 1, 2003); Ex. 1.G. (Domestic Primary Policy, July 1, 2003-July 1, 2004); Ex. 1.H. (Domestic Primary Policy, July 1, 2004-July 1, 2005); Ex. 1.I. (Domestic Primary Policy, July 1, 2005-July 1, 2006); Ex. 1.J. (Domestic Primary Policy, July 1, 2006-July 1, 2007); Ex. 1.K. (Domestic Primary Policy, July 1, 2007-July 1, 2008); Ex. 1.L. (Domestic Primary Policy, July 1, 2008-July 1, 2009).  Vigilant issued a series of primary international commercial general liability policies to Fairfield, individually, "International Primary Policy," collectively, "international primary policies," with separate, annual policy periods from September 1, 2003 to July 1, 2009.  *See* Ex. 2.A. (International Primary Policy, September 1, 2003-July 1, 2004); Ex. 2.B. (International Primary Policy, July 1,

11

2004-July 1, 2005); Ex. 2.C. (International Primary Policy, July 1, 2005-July 1, 2006); Ex. 2.D.

(International Primary Policy, July 1, 2006-July 1, 2007); Ex. 2.E. (International Primary Policy,

July 1, 2007-July 1, 2008); Ex. 2.F. (International Primary Policy, July 1, 2008-July 1, 2009).

Each of the domestic and international primary policies stated, in virtually identical

terms, that Chubb would "pay damages that the **insured** becomes legally obligated to pay by

reason of liability . . . for **bodily injury** or **property damage** caused by an **occurrence** to which

this coverage applies" but only for such "**bodily injury** or **property damage** that occurs during

the policy period." *See* Domestic Primary Policy, "Coverages," Exs. 1.A.; 1.B.; 1.C.; 1.D.; 1.E.;

1.F.; 1.G.; 1.H.; 1.I.; 1.J.; 1.K.; and 1.L.; International Primary Policy, "Coverages," Exs. 2.A.;

2.B.; 2.C.; 2.D.; 2.E.; and 2.F.  Under both the domestic and international primary policies, an

**"occurrence"** is defined as "an accident, including continuous or repeated exposure to

substantially the same general harmful conditions." *See* Domestic Primary Policy, "Definitions,"

Exs. 1.A.; 1.B.; 1.C.; 1.D.; 1.E.; 1.F.; 1.G.; 1.H.; 1.I.; 1.J.; 1.K.; and 1.L.; International Primary

Policy, "Definitions," Exs. 2.A.; 2.B.; 2.C.; 2.D.; 2.E.; and 2.F.

For the policy periods from July 1, 2004 to July 1, 2009, each of the domestic primary

policies and each of the international primary policies contained the Non Accumulation of Limits

Endorsement.  *See* Domestic Primary Policy, "Limits Of Insurance," "Non Accumulation Of

Limits Of Insurance," Exs. 1.H.; 1.I.; 1.J.; 1.K.; and 1.L; International Primary Policy, "Limits

Of Insurance," "Non Accumulation Of Limits Of Insurance," Exs. 2.B.; 2.C.; 2.D.; 2.E.; and 2.F.

Federal also issued a series of commercial excess and umbrella liability domestic policies

to Fairfield, with separate, annual policy periods from July 1, 1997 to July 1, 2008, including the

2004-2008 Excess Policies.  *See* Ex. 3.A. (Excess Policy, July 1, 1997-July 1, 1998); Ex. 3.B.

(Excess Policy, July 1, 1998-July 1, 1999); Ex. 3.C. (Excess Policy, July 1, 1999-July 1, 2000);

Ex. 3.D. (Excess Policy, July 1, 2000-July 1, 2001); Ex. 3.E. (Excess Policy, July 1, 2001-July 1, 2002); Ex. 3.F. (Excess Policy, July 1, 2002-July 1, 2003); Ex. 3.G. (Excess Primary Policy, July 1, 2003-July 1, 2004); Ex. 3.H. (Excess Policy, July 1, 2004-July 1, 2005); Ex. 3.I. (Excess Policy, July 1, 2005-July 1, 2006); Ex. 3.J. (Excess Policy, July 1, 2006-July 1, 2007); Ex. 3.K. (Excess Policy, July 1, 2007-July 1, 2008).  Under its "Coverage A," each excess policy provides "Excess Follow-Form Coverage A," which "applies only if the triggering event that must happen during the policy period of the applicable **underlying insurance** happens during the policy period of this insurance."  *See* Excess Policy, "Coverage/Excess Follow-Form Coverage A," Exs. 3.A.; 3.B.; 3.C.; 3.D.; 3.E.; 3.F.; 3.G.; 3.H.; 3.I.; 3.J.; and 3.K.  Each of the 2004-2008 Excess Policies contained a Sexual Abuse or Molestation Exclusion that applied to bar coverage under those policies for the PPT II Lawsuits and the PPT claims.  *See* Excess Policy, "Sexual Abuse or Molestation Exclusion," Ex. 3.H.; Ex. 3.I.; Ex. 3.J.; Excess Policy, "Abuse or Molestation – Total Exclusion," Ex. 3.K.

III.     <u>LAW AND ARGUMENT</u>

      A.     **Coverage under Each of the Chubb Policies Is Limited to Bodily Injury that Occurred During that Policy's Policy Period.**

An express condition to the application of the Non Accumulation of Limits Endorsements is the language in these Endorsements that the "claim or **suit**" "be ***covered*** under two or more of [the Chubb] policies."  *See* Domestic Primary Policy, "Limits Of Insurance," "Non Accumulation Of Limits Of Insurance," Exs. 1.H.; 1.I.; 1.J.; 1.K.; and 1.L; International Primary Policy, "Limits Of Insurance," "Non Accumulation Of Limits Of Insurance," Exs. 2.B.; 2.C.; 2.D.; 2.E.; and 2.F. (emphasis added).  Critical to understanding what claims or suits are "covered" under the Chubb Policies is that the policies are occurrence-based policies, under which coverage is limited to damages for bodily injury that occurred during the particular

policy's annual policy period.  In this regard, the coverage grant in each of the Chubb primary policies applies only to "damages that the insured becomes legally obligated to pay by reason of liability . . . imposed by law . . . for **bodily injury** . . . that occurs during the policy period." *See* Domestic Primary Policy, "Coverages," Exs. 1.A.; 1.B.; 1.C.; 1.D.; 1.E.; 1.F.; 1.G.; 1.H.; 1.I.; 1.J.; 1.K.; and 1.L.; International Primary Policy, "Coverages," Exs. 2.A.; 2.B.; 2.C.; 2.D.; 2.E.; and 2.F.  Each of the Chubb excess policies similarly requires that the bodily injury occur during the policy period, stating, with respect to Coverage A, the excess follow-form coverage, that "[t]his coverage applies only if the triggering event that must happen during the policy period of the applicable **underlying insurance** happens during the policy period of this insurance," and similarly, with respect to Coverage B, umbrella coverage, that "[t]his coverage applies only to such **bodily injury** . . . that occurs during the policy period." *See* Excess Policy, "Coverage/Excess Follow-Form Coverage A," "Coverages/Umbrella Coverage B," Exs. 3.A.; 3.B.; 3.C.; 3.D.; 3.E.; 3.F.; 3.G.; 3.H.; 3.I.; 3.J.; and 3.K.

Nothing in the language of the Non Accumulation of Limits Endorsements changes the primary or excess Chubb Policies' grants of coverage for bodily injury that occurs within each particular policy's annual period.  Indeed, the Non Accumulation of Limits Endorsements expressly state that those terms and conditions "remain unchanged," and speak in terms of "annual aggregate limits" and limits "for any one policy year." *See* Domestic Primary Policy, "Limits Of Insurance," "Non Accumulation Of Limits Of Insurance," Exs. 1.H.; 1.I.; 1.J.; 1.K.; and 1.L; International Primary Policy, "Limits Of Insurance," "Non Accumulation Of Limits Of Insurance," Exs. 2.B.; 2.C.; 2.D.; 2.E.; and 2.F.

Interpreting similar language, the Connecticut Supreme Court has stated that "[n]either the insurers nor the insured could reasonably have expected that insurers would be liable for

*losses occurring in periods outside of their respective policy coverage periods*.”  *Sec. Ins. Co. v. Lumbermens Mut. Cas. Co.*, 264 Conn. 688, 710 (2003) (emphasis added).  The *Lumbermens* Court noted that “‘[u]nder occurrence basis [comprehensive general liability insurance] . . ., [t]he triggering point . . . is the time of alleged injury, which triggers the . . . carrier’s duty to defend . . . . *The key point is the time of the precipitating injury* . . . .’”  *Id*. at 692 n. 5, *quoting* J. Stempel, *Law of Insurance Contract Disputes* (2002 Sup.) § 14.02, p. 14-9) (emphasis added).

The *Lumbermens* Court further noted, “‘Historically, the [comprehensive general liability policy] has been written on an accident or occurrence basis . . . . According to the express language of the occurrence basis [comprehensive general liability policy], the insurer is obligated to defend claims and pay for covered ‘bodily injury,’ … where the injury is caused by an occurrence and takes place during the policy period.  Thus, the occurrence-basis policy is geared to paying claims for losses that take place during the policy period and result in a policyholder’s legal liability . . . . *[T]here must be an injury from an occurrence during the policy period to trigger occurrence policy coverage*.’”  *Id*. at 697 n. 12, *quoting* J. Stempel, *Law of Insurance Contract Disputes* (2002 Sup.) § 14.09[a][1], p. 14-41) (emphasis added).  Therefore, “if the complaint alleges a liability which the policy does not cover, the insurer is not required to defend” because “the insured’s policies *do not cover* liabilities that reasonably can be apportioned to periods *outside of each respective policy period*.”  *Id*. at 712 (emphasis added).

Accordingly, each Chubb Policy, pursuant to its express language limiting its coverage to “**bodily injury** . . . that occurs during the policy period,” “covers” only those PPT II Lawsuits or PPT claims that allege injury to the PPT plaintiff or claimant during that policy’s time period.  The condition to the application of the Non Accumulation of Limits Endorsement – *i.e.*, that the “claim” or “suit” “be covered under two or more of [the Chubb] policies” – can only be met

when there are two or more Chubb Policies in effect for the same policy period that, therefore, "cover" the same bodily injury that occurred in that policy period.  Any Chubb Policy that was not in effect when the bodily injury occurred does not "cover" such PPT II Lawsuit or PPT claim.  By its very terms, the Non Accumulation of Limits Endorsement has no effect in the absence of such overlapping coverage.  The word "covered" in the Non Accumulation of Limits Endorsements makes clear that, in order for the Non Accumulation of Limits Endorsements to apply, coverage for a "claim or **suit**" must be overlapping under two or more Chubb Policies – *i.e.*, the "claim or **suit**" must be "covered" under two or more such policies.

> **B.     The Non Accumulation of Limits Endorsements Are Anti-Stacking Provisions That Bar Multiple Recoveries for a "Claim or Suit" When Chubb Has Issued Two or More Policies that "Cover" the *Same* Injury in the *Same* Policy Period.**

> > 1.     The Non-Accumulation of Limits Endorsements Are Anti-Stacking Provisions that Apply Where Coverage for a "Claim or Suit" Under Two or More Chubb Policies ***Overlaps.***

Because each of the 2004-2008 Excess Policies contained such a clear Sexual Abuse or Molestation Exclusion barring coverage for the PPT II Lawsuits and PPT claims, Fairfield has argued that, pursuant to the Non Accumulation of Limits Endorsements, PPT II Lawsuits and PPT claims alleging injuries during the periods of those policies are covered under earlier Chubb policy periods which did not contain such an exclusion – specifically, the 1999-2000 Excess Policy.  Fairfield's argument is untethered from the language of the endorsements.  Again, the Non-Accumulation of Limits Endorsements state in virtually identical form:

> This policy is one of several policies issued by us or other member insurers of the Chubb Group of Insurance Companies to you, and/or your subsidiary companies.  It is agreed that any claim or **suit** which could be covered under two or more of these policies will be covered under only the policy with the highest limit of insurance available or, if the limits are the same, under only one of the policies.  Regardless of the number of claims or **suits**, the number of policies, or the number of additional **insureds** which would be involved, the combined total

***annual*** aggregate limits of liability under all such policies to which this endorsement is attached will not exceed the aggregates stated below ***for any one policy year***:

$2,000,000   General Aggregate Limit
            Products-Completed Operations Aggregate Limit
            Advertising Injury and Personal Injury Aggregate Limit

***All other terms and conditions remain unchanged.***

*See e.g.*, Domestic Primary Policy, "Limits Of Insurance," "Non Accumulation Of Limits Of Insurance," Exs. 1.H.; 1.I.; 1.J.; 1.K.; and 1.L; International Primary Policy, "Limits Of Insurance," "Non Accumulation Of Limits Of Insurance," Exs. 2.B.; 2.C.; 2.D.; 2.E.; and 2.F. (bold type in original, underscored, italicized bold type added).

It is telling that Fairfield does not bother to quote the language of the Endorsements ***until page 18*** of its summary judgment brief, and even then, it ***omits everything after the second sentence*** of the Endorsements quoted above.  *See generally* Memorandum of Law in Support of Plaintiff's Motion for Partial Summary Judgment ("Fairfield Summary Judgment Brief"). Fairfield's omission speaks volumes.  The Non Accumulation of Limits Endorsements do not permit Fairfield to reach outside of the policy periods of the 2004-2008 Excess Policies and shift coverage for PPT II Lawsuits or PPT claims alleging molestation and resulting injury during the periods of those policies to the earlier 1999-2000 Excess Policy.  By their plain wording, the Non Accumulation of Limits Endorsements provide that where two or more Chubb Policies "cover" a "claim or **suit**," only the policy limit of one policy applies to such "claim or **suit**," and the combined total "*annual* aggregate limits" of those policies will not exceed the General Aggregate Limit stated for that "*one* policy year."  *See e.g.*, Domestic Primary Policy, "Limits Of Insurance," "Non Accumulation Of Limits Of Insurance," Exs. 1.H.; 1.I.; 1.J.; 1.K.; and 1.L;

International Primary Policy, "Limits Of Insurance," "Non Accumulation Of Limits Of Insurance," Exs. 2.B.; 2.C.; 2.D.; 2.E.; and 2.F. (emphasis added).

The word "covered" in the Non Accumulation of Limits Endorsements makes clear that, in order for the Non Accumulation of Limits Endorsements to apply, coverage for a "claim or **suit**" must be overlapping under two or more Chubb Policies – *i.e.*, the "claim or **suit**" is "covered" under two or more such policies. As explained above, a "claim or **suit**" cannot meet this requirement and be "covered" under two or more Chubb Policies unless those two or more policies cover the same policy period, such that the "claim or **suit**" is covered under both polices. *See Lumbermens*, 264 Conn. at 697 n. 12, 712 (emphasis added) (concluding that, "there must be an injury from an occurrence during the policy period to trigger occurrence policy coverage,'" and "the insured's policies ***do not cover*** liabilities that reasonably can be apportioned to periods outside of each respective policy period"). There cannot be overlapping coverage among the successive Chubb Policies covering separate, annual policy periods for "claims or **suits**" that allege injuries which occurred in different policy years. Therefore, by their very language, the Non Accumulation of Limits Endorsements do not shift coverage for "suits" or "claims" across the different policy years.

That the Non Accumulation of Limits Endorsements apply only when there are two or more Chubb Policies in effect during the same policy period – which therefore, "cover" the same "claim or **suit**" – is also evidenced by the Endorsements' references to "*annual* aggregate limits" and the General Aggregate Limit stated for "any *one policy year*." *See e.g.*, Domestic Primary Policy, "Limits Of Insurance," "Non Accumulation Of Limits Of Insurance," Exs. 1.H.; 1.I.; 1.J.; 1.K.; and 1.L; International Primary Policy, "Limits Of Insurance," "Non Accumulation Of Limits Of Insurance," Exs. 2.B.; 2.C.; 2.D.; 2.E.; and 2.F. (emphasis added). By these

18

references, the Non Accumulation of Limits Endorsements address the maximum limits available *in each policy year* for a "covered" "claim or suit," regardless of the number of policies that Chubb issued to Fairfield for *that particular policy year*. Accordingly, these references clarify that the Non Accumulation of Limits Endorsements apply only when two or more Chubb Policies are in effect for the same "annual" period or for "one policy year" – *i.e.*, for the same policy year.

The law is also clear on the meaning of non-accumulation of limits language like that in Chubb's Non Accumulation of Limits Endorsements. Such "[n]on-stacking, or non-cumulation, provisions prevent an insured from recovering greater liability than that for which was contracted . . . [and] are designed such that an insured may not obtain coverage for ***the same injury*** under multiple policies, thereby obtaining greater coverage than the amount of liability coverage contracted for in a single policy." *Mt. McKinley Ins. Co. v. Corning, Inc.*, 2012 N.Y. Misc. LEXIS 6531, at *15 (Sup. Ct. Sept. 7, 2012) (emphasis added). Noting that the language of the endorsement there did not "reach out of its policy's time period[,]" the court held that it "applie[d] only to policies in effect during ***each particular policy's covering period***." *Id.* at * 18-19 (emphasis added).

Simply put, the function of the Non-Accumulation of Limits Endorsements is, where Chubb has issued two or more policies to Fairfield for the same policy period which, therefore, "cover" the same "claim or **suit**," they limit Chubb's obligation, and Fairfield's recovery, to one policy limit, namely the higher one, or if the limits are the same, to only the limit under one of the policies in that policy year. Accordingly, the endorsements do not permit Fairfield to reach outside of the 2004-2008 Excess Policies, and shift coverage for PPT II Lawsuits or PPT claims alleging injury during the periods of those policies to the earlier 1999-2000 Excess Policy.

2.     The Non Accumulation of Limits Endorsement Do Not Override the Policies' Operation as Occurrence-Based Policies by Reaching Out of the Policies' Policy Periods and Shifting Coverage for Claims or Suits Across <u>Policy Periods.</u>

Fairfield cites a pile of inapposite case law in support of its argument.  The non-cumulation clauses in the cases relied upon by Fairfield contain markedly different language from that in Chubb's Non Accumulation of Limits Endorsements.  Typically, the language in the cases cited by Fairfield is of the "prior insurance and non-cumulation of liability" type, which addresses injury or damage occurring *before* and *after* the policy period, rather than instances where two or more policies cover *the same policy period* and, therefore, *the same injury*.  Those provisions, unlike the Chubb Non Accumulation of Limits Endorsements, expressly address injuries occurring outside the policies' time limitations.  Further, the courts' application of these provisions has been limited to claims for "long-tail" losses – not claims for sexual abuse, which courts have consistently held are covered under occurrence based policies only during the policy periods within which the actual molestation occurred.

For instance, Fairfield cites *Monsanto Company v. Aetna Casualty & Surety Company*, No. 88C-JA-118, 1993 WL 563247 (Del. Super. Ct. Dec. 21, 1993), an unpublished opinion, for the proposition that non-accumulation endorsements "can designate when an injury occurs resulting in a certain policy or policy period to apply."  Fairfield Summary Judgment Brief at 12. However, in *Monsanto*, the court analyzed the following non-accumulation language:

> Insuring Agreement IV is amended to read:  The policy applies only to accidents which occur during the policy period anywhere in the world.  An accident will be considered as occurring only on the date that injury or destruction takes place ***and in the case of continuous or repeated exposure as aforesaid, the accident shall be considered as occurring only on the date that the last injury or destruction results***.

*Monsanto*, No. 88C-JA-118, 1993 WL 563247 at *3 (emphasis added).  *Monsanto* is inapposite here, because the non-accumulation language in that case contained the italicized "deemer"

language, which specifically designated a single date when all injury – despite being continuous in nature and spanning multiple policy periods – occurred, and which is entirely absent from Chubb's Non Accumulation of Limits Endorsements.

Citing *New England Reinsurance Corp. v. Ferguson Enterprises, Inc.*, 208 F. Supp. 3d 431 (D. Conn. 2016) as support, Fairfield also makes the feeble assertion that, "[o]ccasionally, courts have found the language of non-accumulation provisions to be broad enough to contemplate multiple claims or occurrences." Fairfield Summary Judgment Brief at 22. Yet, the non-accumulation clause in *Ferguson* also differed fundamentally from Chubb's Non Accumulation of Limits Endorsements. It stated:

> It is agreed that if any ***loss*** covered hereunder is also covered ***in whole or in part*** under any other excess policy issued to the Insured ***prior to the inception date hereof*** the limit of liability hereon . . . shall be reduced by any amounts due to the Insured on account of such loss ***under such prior insurance***.

*Ferguson*, 208 F. Supp. 3d at 434 (emphasis added). The *Ferguson* clause referred to a "loss" – not a "claim or **suit**," as referenced in Chubb's Non Accumulation of Limits Endorsements. It required that the "loss" be covered under another policy issued to the insured "prior to the inception date" of the policy at issue. No such language exists in Chubb's Non Accumulation of Limits Endorsements. Further, the *Ferguson* clause required that the coverage under the other policy be either "in whole or in part." In contrast, Chubb's Non Accumulation of Limits Endorsements make no "in whole or in part" allowance and do not contemplate instances of partial coverage under another policy, requiring instead that the "claim or **suit**" simply "be covered" under both policies.

Similarly, Fairfield cites *Stonewall Ins. Co. v. E.I. du Pont de Nemours & Co.*, 996 A.2d 1254 (Del. 2010), for the proposition that non-accumulation endorsements "can reduce the limits of recovery from subsequent policies." Fairfield Summary Judgment Brief at 13. However, as

2933814_1

with the other cases cited by Fairfield, the non-accumulation language in *Stonewall* again

differed dramatically from that in Chubb's Non Accumulation of Limits Endorsements.  It stated:

> It is agreed that if any loss covered hereunder is also covered **in whole or in part** under any other excess policy issued to the Assured **prior to the inception date hereof** the limit of liability hereon as stated in Items 5 and 6 of the Declarations shall be reduced by any amounts due to the Assured on account of such loss under such prior insurance.

*Stonewall*, 996 A.2d at 1259 (emphasis added).  By its references to a policy issued "prior to the

inception date hereof" and coverage under that prior policy being "in whole or in part," the non-

accumulation language in *Stonewall*, like the *Ferguson* clause, applied to successive policies

covering consecutive policy periods.  Such language is not present in Chubb's Non

Accumulation of Limits Endorsements.

Moreover, the interpretation reached in *Stonewall* and *Ferguson* is foreclosed here,

because of the references in Chubb's Non Accumulation of Limits Endorsements to the

combined total "*annual* aggregate limits" and the aggregates "for *any one policy year*" (*see e.g.*,

Domestic Primary Policy, "Limits Of Insurance," "Non Accumulation Of Limits Of Insurance,"

Exs. 1.H.; 1.I.; 1.J.; 1.K.; and 1.L; International Primary Policy, "Limits Of Insurance," "Non

Accumulation Of Limits Of Insurance," Exs. 2.B.; 2.C.; 2.D.; 2.E.; and 2.F. (emphasis added)),

each of which makes clear that the endorsements apply only when two or more Chubb Policies

are in effect for the same "annual" period or  for "one policy year" – *i.e.*, **the same policy year** –

and hence "cover" the same injury.

Fairfield cites another inapposite case, *Plastics Engineering Co. v. Liberty Mutual

Insurance Co.*, 466 F. Supp. 2d 1071 (E.D. Wis. 2006), a Wisconsin federal court case analyzing

non-accumulation language of the "prior insurance" type discussed above.  Fairfield Summary

Judgment Brief at 16, *citing Plastics Eng'g Co.*, 466 F. Supp. 2d at 1082, *aff'd* 316 F. Appx. 501

(7th Cir. 2009). In marked contrast to Chubb's Non Accumulation of Limits Endorsements, the *Plastics Engineering Co.* clause referred to instances where "the same occurrence gives rise to personal injury, property damage or advertising injury or damage which occurs *partly before* and *partly within* any annual period of this policy" and, accordingly, like the *Stonewall* and *Ferguson* clauses, to a payment made "under ***a previous policy***[.]" *Plastics Eng'g Co.*, 466 F. Supp. 2d at 1078 (emphasis added). Based on this language, the court concluded that the non-accumulation provision addressed successive policies. *Id.* at 1082. Again, no such language is present in Chubb's Non Accumulation of Limits Endorsements.

In addition, curiously, Fairfield cites *Fed. Ins. Co. By & Through Associated Aviation Underwriters v. Purex Indus., Inc.*, 972 F. Supp. 872 (D.N.J. 1997), for the proposition that non-accumulation endorsements "can cap the maximum limits of recovery for a loss." Fairfield Summary Judgment Brief at 13-14. This citation is particularly absurd, because *Purex* actually supports Chubb's position. There, the court analyzed the following non-accumulation clause:

> If collectible insurance under any other policy issued through Associate Aviation Underwriters is available to the Insured covering a loss also covered hereunder, the Insurer's total liability shall in no event exceed the greater or greatest limit of liability applicable to such loss under this or any other such policy.

*Purex*, 972 F. Supp. at 892. The court rejected the argument that, pursuant to the clause, coverage was limited to the "policy limit under any one policy," finding instead that recovery would not be "prohibited . . . on more than one AAU policy if it can [be] show[n], for example, that <u>more than one loss occurred</u>, or that the loss it suffered was attributable to <u>more than one occurrence covered by an AAU policy</u>." *Id.* (emphasis added). That is precisely the situation presented by the PPT II Lawsuits and PPT claims because each PPT plaintiff or claimant suffered an injury from an occurrence in each policy period in which he was molested. Accordingly, *Purex* lends direct support to the proposition that the Non Accumulation of Limits

23

Endorsements do not shift coverage for all of the PPT II Lawsuits and PPT claims to a single policy year.

In short, with the exception of *Purex* which supports Chubb's position, each of the provisions in the cases cited by Fairfield, unlike the Chubb Endorsements, expressly applied to injury occurring outside of the policy's time period.  *See Mt. McKinley*, 2012 N.Y. Misc. LEXIS 6531, at *20 (describing similar non-accumulation language to that contained in the above cases cited by Fairfield as "expressly consider[ing] an injury occurring outside the time limitations of each policy").[13]  In contrast, language of the type contained in Chubb's Non Accumulation of Limits Endorsements does not "reach out of its policy's time period[,]" but instead "applies only to policies in effect during each particular policy's covering period."  *Id.* at *18-19.  And, the Chubb Non Accumulation of Limits Endorsements are clear that they do not override the policies' operation as occurrence-based policies, stating "[a]ll other terms and conditions remain unchanged."  Accordingly, Fairfield's forced construction of the Non Accumulation of Limits Endorsements as allowing it to shift coverage for "claims" or "suits" across different policy periods, irrespective of when the injuries alleged in such claims or suits occurred, must be

---

[13] In keeping with its effort to distract the Court from the actual language of the Chubb Non Accumulation of Limits Endorsements, Fairfield also cites *In re Viking Pump, Inc.*, 52 N.E.3d 1144 (N.Y. 2016), for the proposition that non-accumulation provisions "were purportedly designed to prevent any attempt by policyholders to recover under a subsequent policy . . . for a loss that had already been covered by the prior . . . policy."  Fairfield Summary Judgment Brief at 6.  However, as with the other cases cited by Fairfield, *Viking Pump* is inapposite.  It analyzed non-accumulation provisions of the prior insurance type discussed above, which addressed instances where "the same occurrence gives rise to personal injury, property damage or advertising injury or damage which occurs *partly before* and *partly within* any annual period of this policy," and which also specifically contained a continuing coverage clause addressing instances where "personal injury or property damage arising out of an occurrence covered hereunder is *continuing at the time of termination of this Policy*."  *Viking Pump*, 52 N.E.3d at 1147-48 (emphasis added).  The *Viking Pump* court held that, by their reference to a loss "covered **in whole or in part**" under another policy issued "**prior to the inception date**" of the instant policy, such prior insurance and non-accumulation provisions contemplated situations where a continuing loss – such as the asbestos bodily injury claims at issue there – triggered multiple, successive policies.  *Id.* at 1153 (emphasis added).  No such language is present in the Chubb Non Accumulation of Limits Endorsements.  Moreover, as discussed below, unlike the continuous injury, long-tail asbestos bodily injury claims addressed in *Viking Pump*, the sexual molestation suits and claims at issue here present discrete acts of molestation and resulting injury that trigger coverage only in the policy period in which the PPT plaintiff or claimant was molested.

rejected.  *See Schilberg Integrated Metals Corp. v. Continental Cas. Co.*, 263 Conn. 245, 268

(2003) ("courts cannot indulge in a forced construction ignoring provisions or so distorting them

as to accord a meaning other than that evidently intended by the parties").

                  3.      The Non Accumulation of Limits Endorsements Are, in Effect, "Other
                            Insurance" Provisions.

Fairfield also asserts that "non-accumulation endorsements are not 'Other Insurance'

provisions."  Fairfield Summary Judgment Brief at 16.  Fairfield's assertion, as applied to the

language of Chubb's Non Accumulation of Limits Endorsements, is flatly incorrect, and several

courts have noted the same.

The non-accumulation clause analyzed in *Mt. McKinley* stated:

> If the insured has other valid and collectible insurance, other than insurance
> specifically in excess hereof, with any other insurance covering a loss also
> covered by this policy, the insurance afforded by this policy shall be in excess of
> and shall not contribute with such other insurance.  ***If the insured has any other
> policy or policies of insurance with the company <u>covering</u> a loss <u>also covered</u> by
> this policy (other than insurance in excess hereof), the insured shall elect which
> policy shall apply and the company shall be liable under the policy so elected
> and the company shall not be liable under any other policy.***

*Mt. McKinley*, 2012 N.Y. Misc. LEXIS 6531 at *18 (emphasis added).  Relying on this policy

language, the *Mt. McKinley* court characterized such language as an "other insurance" provision

because this type of "[n]on-stacking, or non-cumulation, provision[] . . . [is] designed such that

an insured may not obtain coverage for the ***same injury*** under multiple policies, thereby

obtaining greater coverage than the amount of liability coverage contracted for in a single

policy."  *Id.* at *17 (emphasis added).  It went on to note that such clauses are, in effect, "an

'other insurance' clause[,]'" reasoning that:

> This type of clause shown in the policies is . . . an "other insurance" clause.
> These clauses apply when multiple policies cover the same injury ***during the
> same time period***.  The endorsements function as a bar to multiple recoveries for

the same injury during the same time period.  ***This is exemplified in the language of the endorsements, none of which reach out of its policy's time period***.

*Id.* (emphasis added).

Other courts that have analyzed the issue are in accord.  For example, in *Boson Gas Co. v. Century Indemnity Co.*, 454 Mass. 337, 910 N.E.2d 290 (Mass. 2009), the court analyzed the following clause:

> If collectible insurance under any other policy of [this insurer] is available to [the insured], ***covering*** a loss ***also covered hereunder***, [this insurer's] total liability shall in no event exceed the greater or greatest limit of liability applicable to such loss under this or any other such policy provided, however, this does not apply to insurance with [this insurer] which is written as underlying insurance or which is written as excess insurance over the limit provided in this policy.

*Boston Gas Co.*, 454 Mass. at 343, 910 N.E.2d at 296 (emphasis added).  As with Chubb's Non Accumulation of Limits Endorsements, the *Boston Gas Co.* clause addressed instances of overlapping coverage – where two or more of the same insurer's policies "cover" the same injury or damage.  The *Boston Gas Co.* correctly recognized that such provisions operate, in effect, as "Other Insurance" provisions, and do not provide coverage for injuries occurring before or after the policy's time period, stating:

> . . . [the] clauses do not reflect an intention to cover losses from damage outside the policy period.  Rather, [they] simply reflect a recognition of the many situations in which concurrent, not successive, coverage would exist for the same loss.

*Boston Gas Co.*, 454 Mass. at 361, 910 N.E.2d at 308.

Fairfield cites the "Other Insurance" provision contained in the Chubb international primary policies containing the Non Accumulation of Limits Endorsements, and suggests that the presence of such "Other Insurance" provision somehow defeats Chubb's interpretation of the Non Accumulation of Limits Endorsements.  *See* Fairfield Summary Judgment Brief at 17.  This argument is a red herring.  This "Other Insurance" provision cited by Fairfield addresses

situations of concurrent policies, where *a company other than Chubb* issued the other policy or policies providing the concurrent coverage to Fairfield. In contrast, the Non Accumulation of Limits Endorsements address situations of concurrent policies, where *Chubb issued both of the policies* providing the concurrent coverage to Fairfield. Policies simultaneously containing both types of provisions have been addressed by courts and have given the courts no pause. *See, e.g., Mt. McKinley*, 2012 N.Y. Misc. LEXIS 6531 at *18 (addressing non-accumulation clause that addressed, in one part, situations where the insured has "other insurance covering a loss also covered by this policy[,]" and in another part, situations where "the insured has any other policy or policies of insurance **with the company** covering a loss also covered by this policy") (emphasis added); *Boston Gas. Co.*, 454 Mass. at 343-44, 910 N.E.2d at 296 (addressing a clause entitled "Other Insurance **with [Century]**" and a clause in the same policy entitled "Other Insurance **Not with [Century]**") (emphasis added).

Simply put, because Chubb's Non Accumulation of Limits Endorsements refer to instances where the same "claim or **suit**" is "covered under two or more" of the occurrence-based policies issued by Chubb to Fairfield for particular policy years, the Non Accumulation of Limits Endorsements address instances of concurrent, not successive, policies and are, in effect, "Other Insurance" provisions.

**C.      The PPT II Lawsuits Are Not Long-Tail Claims, But Even If They Were, the PPT II Lawsuits Alleging Injuries During the 2004-2008 Excess Policies Are Not "Covered" by the 1999-2000 Excess Policies.**

1.      <u>An Occurrence-Based Policy Is Triggered, and Therefore "Covers," a Sexual Abuse Claim or Suit Only If the Act of Sexual Abuse and Injury Occurred During the Policy Period.</u>

Courts that have considered the issue have treated sexual abuse or molestation claims as triggering coverage only under an occurrence-based policy in effect when the bodily injury – *i.e.*,

27

the bodily injury from the act of molestation – occurred. *See, e.g., Society of Roman Catholic Diocese of Lafayette & Lake Charles, Inc. v. Interstate Fire & Cas. Co.*, 26 F.3d 1359, 1366 (5th Cir. 1994) (holding that "[e]ach carrier is responsible, up to its occurrence limits, for all damages emanating from molestations that occur during the insurer's policy period.  All molestations occurring outside a carrier's policy are covered by the insurer on the risk at the time of the molestation."); *Interstate Fire & Cas. Co. v. Archdiocese of Portland*, 35 F.3d 1325, 1327-28, 1331 (9th Cir. 1994) (concluding "each policy covers only damages stemming from [the plaintiff's] exposure to Father Laughlin occurring during the policy period").  The decision in *Diocese of Lafayette* was cited in *H.E. Butt Grocery v. Nat'l Union Fire Ins. Co*., 150 F.3d 526, 531 (5th Cir. 1998), where "two independent acts of sexual abuse 'caused' the two children's injuries and gave rise to [the insured's] separate and distinct liability in each case."  In turn, *H.E. Butt Grocery* has been cited with approval by the Connecticut Supreme Court.  *See Metro. Life Ins. Co. v. Aetna Cas. & Sur. Co.*, 255 Conn. 295, 309, 310, 322 (2000) (citing *H.E. Butt Grocery* as finding that, once child was molested by pedophilic employee, there was resulting injury triggering the negligent supervising employer's occurrence-based policy in effect at the time the molestation occurred).[14]

.

---

[14] The Connecticut Supreme Court, in *Metro. Life Ins. Co.*, analyzed the term "occurrence" – albeit in the different context of asbestos bodily injury claims.  Even so, the decision is instructive because it held that the "occurrence" was each claimant's initial exposure to asbestos, rather than the insured's alleged failure to publicize adequately the dangers of asbestos exposure, which began at some point during the 1930s.  *Metro. Life Ins. Co.*, 255 Conn. at 298, 304-305.  The court employed an "event test," under which an "occurrence" is determined by reference to "the event or events triggering liability on the part of the insured" – that is, "the 'last link in the causal chain' leading to [the insured's] liability" – and rejected the so-called "cause test," under which courts look to "some point further back in the causal chain."  *Id.* at 313, 315, 316, 317-318, 322.

Because each of the Chubb Policies applies only to "**bodily injury** . . . that occurs during the policy period," each PPT II Lawsuit or PPT claim triggers coverage, and is therefore "covered" – a condition to the application of the Non Accumulation of Limits Endorsements – only under the Chubb Policy in effect when that PPT plaintiff or PPT claimant was molested. Any Chubb Policy not in effect at that time of molestation of that PPT plaintiff or claimant does not "cover" his PPT II Lawsuit or PPT claim.

2.    The PPT II Lawsuits and PPT Claims Are Not "Long-Tail" Claims.

Contrary to Fairfield's unsupported contention, the PPT II Lawsuits and PPT claims are not "long-tail claims."  Courts recognize that, in contrast to claims like sexual molestation claims in which the point of injury is discernable, "long-tail claims" are claims involving progressive injuries – such as asbestos bodily injuries or environmental contamination injuries – in which it is scientifically impossible to pinpoint when the injury occurred.  *See Boston Gas Co. v. Century Indem. Co.*, 454 Mass. 337, 350 (2009) (stating that "long-tail claims" are "for injuries which take place over many years and are caused by environmental damage or toxic exposure" in which "it is both <u>scientifically and administratively impossible</u> to allocate to each policy the liability for injuries occurring only within its policy period") (emphasis added); *see also* 5 G. Couch, Insurance § 220:25, at 220-26 (3d ed. 2005) (with respect to "environmental damage and toxic exposure cases . . . it is virtually impossible to allocate to each policy the liability for injuries occurring only within its policy period"); *Spaulding Composites Co. v. Aetna Cas. & Sur. Co.*, 176 N.J. 25, 39 (2003) (noting "the cripplingly complex area of long-tail environmental exposure insurance coverage").

In contrast to "long-tail" asbestos and environmental contamination claims, the PPT II Lawsuits and the PPT claims are not "long-tail claims," because it is not "both scientifically and

administratively impossible" to pinpoint when an injury in the PPT II Lawsuits and PPT claims

occurred.  As explained above, the PPT II Lawsuits and the PPT claims involve discrete

instances of abuse and resulting, discernable injury that happened when the abuse occurred, and

therefore, the PPT II Lawsuits and PPT claims are only covered within the policy periods in

which the plaintiff or claimant sustained actual abuse and resulting injury.

Notably, Fairfield does not cite a single case treating sexual abuse claims as "long-tail

claims," nor a single case concerning the determination of the "occurrence" or dates of bodily

injury in instances of sexual abuse.  Instead, Fairfield cites a host of cases involving long-latency

claims, such as environmental contamination and asbestos bodily injury claims, and not sexual

abuse claims.  *See e.g.*, *R.T. Vanderbilt Co., Inc. v. Hartford Accident & Undem. Co.*, 156 A.3d

539, 548 (Conn. App. Ct. 2017) ("long latency asbestos related claims"); *Federal Ins. Co. by &

through Associated Aviation Underwriters v. Purex Indus.*, 972 F. Supp. 872, 876 (D.N.J.)

(groundwater and soil contamination); *State of California v. Continental Ins. Co.*, 281 P.3d 1000,

1005 (Cal. 2012) (environmental damage involving "long-tail" injury, characterized as "a series

of indivisible injuries attributable to continuing events without a single unambiguous 'cause,'"

and noting, "[i]t is often virtually impossible to prove what specific damage occurred during

each of the multiple consecutive policy periods in a progressive damage case"); *Chicago Bridge

& Iron Co. v. Certain Underwriters at Lloyd's*, 797 N.E.2d 434, 440 (Mass. App. Ct. 2003)

("continuing environmental contamination" implicating policies issued in nine years); *Keene

Corp. v. Ins. Co. of N. America*, 667 F.2d 1034, 1038,  (D.C. Cir. 1981) (asbestos related claims

for injury as a result of inhalation, noting that "inhalation may continue through numerous policy

periods, the disease may develop during subsequent policy periods, and manifestation may occur

in yet another policy period"); *Plastics Eng'g Co. v. Liberty Mut. Ins. Co.*, 466 F. Supp. 2d 1071,

1073-1077, 1081 (E.D. Wis. 2006) (claims for asbestos related injuries and wrongful death, alleging injury over a period of time, resulting from "ongoing or continuous exposure," implicating multiple policy periods).

Moreover, even if the PPT II Lawsuits and PPT claims were "long-tail claims," which they are not, the Non Accumulation of Limits Endorsements still would not reach outside of a policy's policy period to shift coverage for the PPT II Lawsuits and PPT claims triggering the 2004-2008 Excess Policies to the earlier 1999-2000 Excess Policy.  In *Mt. McKinley*, the court was actually faced with "long-tail" claims – asbestos-related bodily injury claims – and non-accumulation language similar to Chubb's Non Accumulation of Limits Endorsements.  Even so, the *Mt. McKinley* court rejected the insured's argument that "the non-cumulation language in the policies allow [the insured] to recover all coverage in a single year as if the injury occurred in that year alone[,]" noting that the endorsements instead "function as a bar to multiple recoveries for ***the same injury*** during ***the same time period***."  *Mt. McKinley*, 2012 N.Y. Misc. LEXIS at 6531 at *17, 18 (emphasis added).  Here, there is no language in Chubb's Non Accumulation of Limits Endorsements that reaches out of each respective policy's policy period to provide coverage for injuries that occurred *outside* of the policy's policy period.

D.      **The PPT II Lawsuits Do Not Constitute A Single "Suit."**

Fairfield appears to recognize that, if each of the 169 total underlying claims and suits comprising the PPT II Lawsuits, the Represented Claims, and the Unrepresented Claims is treated for what it is – a separate "claim" or "suit" – its argument necessarily fails.  This is because, even under Fairfield's interpretation of the Non Accumulation of Limits Endorsements as allowing it to shift coverage for a "claim" or "suit" across different policy years, most of the PPT II Lawsuits and PPT claims do not allege injuries occurring during the 1999-2000 Excess

31

Policy or any available Chubb Policy that does not contain the Sexual Abuse or Molestation
Exclusion.

Apparently recognizing this, Fairfield attempts to portray the 169 total PPT II Lawsuits
and PPT claims as a single "suit."  Fairfield Summary Judgment Brief at 21-23.  Fairfield argues
that, under the Non Accumulation of Limits Endorsement, coverage for such a purported single
"suit" would be shifted to the 1999-2000 Excess Policy because such a "suit" would include
some claims covered under that earlier policy, even though most of the claims in such a
purported single "suit" would have alleged injuries occurring after July 1, 2004 and, therefore,
would not be covered under that policy or any Chubb excess policy.

The PPT II Lawsuits and PPT claims are not a single "suit."  Much to its chagrin,
Fairfield cannot twist the procedural history of the PPT II Lawsuits to transform the 169 separate
PPT II Lawsuits and PPT claims into a single "suit."  First, Fairfield implies that, because the
PPT II Lawsuits were consolidated for pretrial purposes only, they are a single "suit."[15]  This
argument is nonsensical.

The consolidation of the PPT II Lawsuits was for pretrial purposes only.  *See* Orders
dated January 6, 2014, March 28, 2014, June 26, 2014 and March 27, 2018 (all per Chatigny,
U.S.D.J.), USDC Docket, *St. Louis*.  Moreover, the consolidation of the PPT II Lawsuits for such
pretrial purposes did not strip each of the PPT II Lawsuits of its status as an individual civil
proceeding.  *See* Order dated January 6, 2014 (Chatigny, U.S.D.J.), USDC Docket, *St. Louis*
(directing the Clerk's office "to consolidate the following cases for pretrial purposes" only); *see*

---

[15] The Represented Claims and the Unrepresented Claims were not brought as "suits," and therefore, they were not
even part of the consolidation for pretrial purposes.  The term "claim" is not defined in the domestic or international
primary policies containing the Non Accumulation of Limits Endorsements.  The term "suit" is defined in those
policies as "a civil proceeding in which damages, to which this insurance applies, are sought.  Suit includes an
arbitration or other dispute resolution proceeding in which such damages are sought and to which the insured must
submit or does submit with our consent."

*also* Joint Status Reports of Counsel dated March 24, 2014 and June 23, 2014, *St. Louis* (stating defendants', including Fairfield's position, that the PPT II Lawsuits should be consolidated "for pre-trial purposes").  Accordingly, there is no basis on which to assert that consolidation of the PPT II Lawsuits, for pretrial purposes only, transformed those fifty-one (51) separate lawsuits into a single "suit."

Second, Fairfield appears to argue that, because the PPT II Lawsuits and PPT claims settled using a class settlement structure, they are a single "suit."  This argument is also nonsensical.  The PPT II Lawsuits were <u>not</u> brought as a class action.  They were <u>brought</u> as fifty-one (51) separate lawsuits.  ███████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████  However, as the "vehicle" for settlement, the class settlement structure can hardly be said to have transformed the fifty-one (51) separate PPT II Lawsuits, plus the additional 118 Represented Claims and Unrepresented Claims, into a single "suit."

The class complaint did not assert new claims or seek actual damages against Fairfield or the other defendants, as would be required for it to be a "suit" under the Chubb Policies – *i.e.*, that is, "a civil proceeding in which damages, to which this insurance applies, are sought."

████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

This limited, singular purpose of the class complaint is borne out by the terms of the Settlement Agreement and the PPT plaintiffs' agreed-upon Motion for Leave to file the class complaint:



- ███████████████████████████████ the PPT plaintiffs' Motion for Leave to file a class action complaint did not seek class certification for any purpose *other than* effectuating the parties' settlement, stating that "[d]efendants consent to this motion solely for purposes of facilitating amendments to Plaintiffs' complaints to effectuate the proposed settlement described herein[,]" that "[a]s the proposed amended complaint demonstrates, Plaintiffs are not adding new parties nor are they adding new counts or damages claims[,]" and that, if the court does not approve the settlement, the class action complaint "will be withdrawn" and "the original Complaints will remain the operative pleadings in Plaintiffs' cases." *See* Motion for Leave, USDC Docket, *St. Louis*, docket entry dated January 25, 2019, at 4, 5.

By the clear, agreed-upon terms on which it was filed, the class complaint is not "a civil proceeding which damages . . . *are sought*[,]" and therefore, does not meet the definition of "suit." ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

As evidenced by the agreed-upon terms upon which it was filed, the class complaint was understood by all parties as the "vehicle" for resolving all suits and claims – filed or unfiled – against Fairfield forever.  What was settled, and what was covered or not covered under the Chubb Policies, were the fifty-one (51) PPT II Lawsuits and the 118 unfiled Represented Claims and Unrepresented Claims, each of which asserted claims for injuries to a different plaintiff or claimant occurring in a different policy year or years.

Tellingly, Fairfield does not cite a single case finding that such a class settlement structure, used merely as a "vehicle" for settling several pending, individual lawsuits and claims against the insured and barring future, as-yet-unfiled claims against the insured, is a "suit[,]" let alone that it transforms the separate lawsuits and unfiled claims comprising it into a single "suit" for insurance coverage purposes.  Such a "forced construction" of the policy language is proscribed by Connecticut law.  *See Schilberg*, 263 Conn. at 268.

### E.   Even If All of the PPT II Lawsuits Constituted a Single "Suit," It Would Not Allow Fairfield to Recover under a Single Policy Year.

Even if the combined total 169 PPT II Lawsuits, Represented Claims, and Unrepresented Claims were somehow a single "suit" under the Chubb Policies, which they are not, it would not change the coverage result.  As explained above, by their references to "*annual* aggregate limits" and the General Aggregate Limit stated for "any *one policy year*," the Non Accumulation of Limits Endorsements apply only when there are two or more Chubb Policies in effect during the same "annual" period or "one policy year" – i.e., ***during the same policy period*** – that, therefore, "cover" the same injury.  Accordingly, even if the 169 claims and suits at issue here presented a single "suit," the endorsements do not shift coverage for the injuries alleged in such a "suit" across the different Chubb policy years.

Moreover, even if, as Fairfield insupportably contends, the Non Accumulation of Limits Endorsements allowed the shifting of coverage for claims and suits across the different policy years, Fairfield still would not be able to recover for all of the PPT II Lawsuits and PPT claims in a single policy year.  A single "suit," had it existed (which it did not), would have alleged instances of sexual abuse and resulting injuries that occurred in more than one policy period.  Therefore, each of the successive Chubb Policies would apply to cover, at most, only the bodily injury that occurred during the time period of that policy, but none of them would apply to cover any bodily injury occurring outside of the time period of that policy.  *See Lumbermens*, 264 Conn. at 712 ("the insured's policies *do not cover* liabilities that reasonably can be apportioned to periods *outside of each respective policy period*") (emphasis added).  As such, each of the successive Chubb Policies would apply to "cover," at most, only a part of such "suit," but none of them would apply to "cover" the "suit" in whole.

## IV.   CONCLUSION

For all of the foregoing reasons, Chubb respectfully requests that the Court deny Fairfield's Motion for Partial Summary Judgment as to Non Accumulation.

Respectfully submitted,

FEDERAL INSURANCE COMPANY and
VIGILANT INSURANCE COMPANY,

By:   */s/ John J. McGivney*

_____
John J. McGivney, Fed. Bar No. 31096
Michael D. Riseberg, Fed. Bar No. 31088
Kara A. Loridas, Fed. Bar No. 30186
Rubin and Rudman LLP
53 State Street
Boston, MA 02109
Tel:  (617) 330-7000
Fax:  (617) 330-7550
jmcgivney@rubinrudman.com
mriseberg@rubinrudman.com
kloridas@rubinrudman.com

Michael P. Thompson
Dennis O. Brown
Kelcie B. Reid
Gordon Rees Scully Mansukhani, LLP
95 Glastonbury Boulevard, Suite 206
Glastonbury, CT 06033
Tel:  (860) 494-7504
Fax:  (860) 560-0185
mpthompson@grsm.com
dbrown@grsm.com
kreid@grsm.com

## CERTIFICATION OF SERVICE

I hereby certify that on September 9, 2021, the foregoing was electronically filed and served by mail on anyone unable to receive notice of electronic filing.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail on anyone unable to receive notice of electronic filing as indicated in the Notice of Electronic Filing.  Parties may access this document through the Court's CM/ECF System.

*/s/ John J. McGivney*_____
John J. McGivney